Case number 21-1191 et al. Constellium Rolled Products Ravenswood, LLC petitioner versus National Labor Relations Board. Mr. Connealy for the petitioner, Mr. Heller for the respondent, Mr. Kilbert for the intervener. Mr. Connealy, good morning. Please proceed. Thank you, Your Honor. And may it please the Court, Michael Connealy on behalf of Constellium, I'd like to reserve three minutes for rebuttal. For 20 years, this Court and its members have told the NLRB that employees do not need special leeway to engage in sexually or racially offensive conduct to further their interests under federal labor law. But employers do need broad latitude to discipline such misconduct to fulfill their responsibilities under the Equal Employment Opportunity Law. The Board looked like it had gotten the message in 2020 in General Motors. That case replaced the Board's flawed existing framework with the familiar right-line test. It recognized that sexually or racially offensive conduct is analytically distinct from protected concerted activity, even when it is performed for the sake of the protected end. The ends don't justify the means. Now an employer may lawfully combat offensive misconduct, it just can't retaliate against protected activity. Unfortunately, the Board's ruling in this case is impossible to defend under that approach. And the clearest signal of this may be the two main defenses the Board, Council, and the Union propose in this Court. First, a meritless appeal to the law of the case doctrine. And second, the same analytical mistake that General Motors condemns, namely collapsing the distinction between the abuse of misconduct and the protected activity it seeks further. The Board's decision on remand commits two significant errors, either of which is sufficient to deny enforcement. First, the Board completely ignored its own prior finding that Constellium broadly tolerated the protected activity here, the overtime protests. As well as the ALJ's related finding that Constellium lacked animus for the protests. And second, the Board fixated on supposed evidence of disparate treatment as its sole basis for animus, but it failed to scrutinize this evidence to ensure it actually suggests animus. And worse, this single-minded approach recreates the very conflict between labor law and EEO laws that the Board... Is animus really the only issue that's left beyond law of the case? I think animus is the central issue, Your Honor. We do have an argument at right-line step two, but a lot of the evidence is the same for both prongs of the analysis. It's really a question of who bears the burden. Of course, the Board bears the burden on animus at step one, and that was the part of the right-line analysis that the ALJ seized upon in his original ruling. So we think... I would suggest animus is probably the core issue for the Court. And on animus, I think the first thing that the Board did wrong was refuse to even analyze the Board's own 2018 finding that the company had tolerated a wide range of activities in support of the protests. Nothing was introduced that they tolerated anything like what happened here, where you got the actual offensive language written on the sign-up board, a video of him doing it. Nothing rose to that level or sank to that level, did it, of what they offered? No, Your Honor. There was no comparable episode in the record. The only things that the Board cited in its decision as comparable misconduct were verbal use of the phrase. We're not clear on the timing for that, but there's some evidence that it occurred before Mr. Williams and some evidence that it occurred after Mr. Williams wrote the words. And then graffiti usage, but there's no indication that the company knew who was responsible for the graffiti. And the union's own representative, Mr. Beagle, testified to that at the hearing. So we do think that the only reasonable inference based on the employer taking no action for six months of overtime boycotting, when that caused significant operational issues for the company, which Mr. Harmerson testified about, is that the company took action shortly after Mr. Williams wrote the phrase on the bulletin board in a centrally located location on employer property, which then prompted the specific individuals who had already filled out their own initials and signed up for overtime to complain that they felt offended. And in fact, one of them asked the company to intervene and said that he felt targeted to Mr. Lawson. So there's nothing comparable to that, that the employer could be accused of having failed to correct. And I think that's why the ALJ found this to be a pretty straightforward case for finding no animus. The board was at a minimum required to grapple with that history, which is not disputed. The facts aren't disputed on that point. The only possible dispute is its significance. But I was not relevant under Atlantic Steel, the old framework. And then this court acknowledged the history and even said it might be significant under Rightline. But at that time, Rightline was not the operative test. So it wasn't significant then. But then when Rightline became the test on remand after General Motors, the board had a duty to grapple with this evidence. And we cite a number of cases from this court that say that when the board completely fails to consider an decision, that the decision lacks reasoned decision-making and is arbitrary and capricious, especially when the board also fails to explain the basis of its disagreement with the ALJ. So that would be our first submission before this court, is that the board failed to grapple with that extremely important evidence in the ALJ finding. On the disparate treatment point, we think there's a second error, and in some ways, maybe even a more significant error, given its potential implications for future cases. The board made no effort to ensure that the comparable cases showed genuine pretext, that the employer was not really motivated by what Mr. Williams did, but was instead motivated... The issues really blend into one. I mean, the significance of disparate treatment is to show that, or attempt to show, that the board wouldn't have taken the action based on the wrongdoing alone, and therefore, it must have had anti-union animus. I think that's right, Your Honor, but I think in the General Motors type of case, and this type of case specifically, it's especially important to consider the evidence of disparate impact, because under the hostile work environment laws, a plaintiff can prevail based on either severe or pervasive workplace mistreatment. And so, courts look at that in hostile work environment cases in the aggregate. And so, it's no excuse under the EEO laws that comparable misconduct has been ongoing. In fact, that just makes it worse. Under those laws, an employer has to be able to say enough is enough, whether because the conduct has gotten worse, as I think is the case here, or even if it just continues unabated. Eventually, the employer has to step in and put a stop to it. But under the board's approach, if we're not going to consider whether the employer had any other indications of animus towards the protected activity, and we're not going to really evaluate whether the episodes of past misconduct that went uncorrected are comparable in a meaningful way, then the employer is really locked in to tolerating misconduct under the NLRA based on toleration of past episodes. And I think the union's brief is particularly transparent on this, because it argues at 31 that it shouldn't be easy for employers to turn over a new leaf if they failed the correct misconduct in the past. But that's exactly backwards under the EEO law. And so, I think that we don't have to acknowledge kind of that approach, though, to affirm what the board did here, right? I mean, if you've dug yourself into a hole because you haven't really been enforcing, you, the company, been enforcing anti-harassment and anti-discrimination laws, and so it's going to look like disparate treatment if you all of a sudden say, start doing so, and coincidentally it's someone who is engaging in protected union activity when you finally make the decision to start doing so, then, you know, why should we have much sympathy for that? That doesn't mean that you can't tomorrow start enforcing those laws uniformly across the board. And if you have a situation where someone is arguably engaging in protected activity while they're doing something that's harassing or discriminatory, you won't be the subject of a successful kind of pretext action. Why isn't that just a way that this can work out? And why isn't that reason? Well, we certainly are arguing for, you know, a categorical rule that disparate treatment evidence can never be a sign of pretext. Here, there's no evidence that Constellium failed to take comparable action after it disciplined Mr. Williams with respect to other individuals who had prompted an investigation, who had caused their co-workers to complain in a similar way, and whose identities were known to the decision-makers here. And so, but I think with this particular record, it's extremely hard to avoid falling into that catch-22 where the employer can't comply both with federal labor law and the EEO laws, given the history of tolerating the overtime protest that had gone on for six months, and that sort of temporal lack of any sort of temporal connection, temporal proximity between the start of the protest and- I think I heard you arguing before that they really haven't violated federal labor law. Yes. If they're acting without that any unanimous, they're simply disciplining for this egregious conduct, then there's no federal law violation, right? Yes, that is our position. I took Judge Wilkins to be asking, you know, if there is a federal labor law violation, are employers really in that catch-22? I'm sorry if I misunderstood that question, but- and my answer would be, if there is this conflict, and even if there is just some reluctance because of the risk of a federal labor law violation that stops an employer from action that it should take to correct an existing case of misconduct in the workplace, then that would be the sort of conflict that concerns me, and I think that the court should do that over my time, and would like to save some time for rebuttal, if I may. All right, thank you. Mr. Heller? Good morning. May it please the court. Joel Heller for the National Labor Relations Board. The court remanded this case to the board with instructions to address the interaction between the NLRA and anti-discrimination law. The board did that, applying its intervening General Motors decision and holding that the familiar right-line test should apply to these types of cases. The issue before the court now is the application of that test to the facts in this case. Employer motive is a question of fact, which is reviewed for substantial evidence. Substantial evidence has to be such as would convince a reasonable person that- A substantial evidence, yes. When any reasonable fact- What is your evidence here should be convincing us that they would not have disciplined him for his egregious conduct, but for his protected conduct? Correct, they would not. The evidence is the disparate treatment evidence, which the board lays out in the case. Sorry, Your Honor? Repeat, please. The disparate treatment evidence. Disparate treatment presupposes a similarity of the person being treated, is it not? Yes, it's a similarity. Now, it doesn't have to be identical, but yes, similarity. And similarity is a question of fact. There has to be a dissimilar protected activity history and a similar violation for it to be fully relevant, wouldn't it? But it has to be similar conduct in the past that the employer- What's your closest case, closest evidence of disparate treatment? That other employees, and not just employees, but also supervisors, were using the very same phrase that Mr. Williams- Did any of them write it on the sign-up board that their fellow workers would have to be putting their names to participate in the overtime program? No, we don't have evidence of anyone else writing it. They definitely had the same kind of strong evidence, e.g. the video with any of these others that they had within. Well, it's not contested that other people were using the same language, including supervisors. Now, I agree, no one else was writing it down. The time at which they knew about it is not established by your evidence, is it? The employer knew that, yes, there's testimony from employees that they used this phrase in front of supervisors, including Mr. Harmeson, who is one of the individuals that Consalium says was a decision-maker. Is there evidence as to whether or not these other people had been unionists, such that if there were an anti-union animus, it would have extended to them also? All of these individuals were using the phrase, the employees were using this phrase to protest the employer's new overtime policy. They were talking about terms and conditions of employment. The only animus, the only act as to which you were claiming the protection of the act is the use of the word, is that correct? He didn't have any prior history of activism? The record shows, right, the only protected activity we're talking about is his writing. I'm wondering, if you are claiming this evidence is animus, why didn't they fire those other people who were engaging in similar activity, but not the same activity? If anti-union animus was a but-for cause, wouldn't they have fired them if they were union activists also? Well, it is established, as we cite in the brief, that an employer doesn't have to fire all union supporters, just to mean that they unlawfully retaliated against an individual. I mean, I can think of any number of reasons they could have imagined. The record shows that they'd been hit with a million dollar verdict for hospital workplace, right? That's true, in December. Is it really unreasonable to believe that they fired somebody for an egregious act contributing to a hospital workplace? Well, the problem with that argument, Your Honor, is that other people were using profane and sexually tinged language. Let's go to the yes or no question. Is it really unreasonable to suppose that a company that had been hit with a million dollar hospital workplace judgment would fire somebody who was egregiously contributing to a hospital workplace? The abstract, no. But on the facts of this case, the question is whether they would have discharged Mr. Williams absent his protected conduct, not whether they could have. But the only protected conduct you cited now is the language on the sign-up sheet. Well, protected conduct is... Is that protected conduct? Protected conduct is protesting the overtime policy. I think we all agree with that. Other people protested it and were not fired. He did a more egregious act and he was fired. I don't see what's unreasonable about believing that they were attempting to protect their status as a non-hospital workplace. So that, I think, goes back to the question of whether the other individuals were similarly situated. Yes, it does. Yes, it does. And that's a question of fact, which is reviewed for substantial evidence. Now, the board found that they were similar. And also, I would point out that this court in its prior holding in this case, held, found that Consalian disciplined Williams because of the content of his message. Not that it was written down or where it was, but the content, the words that he was using. And other employees were using those exact same words and they were not discharged. That is classic disparate treatment evidence. And the fact that other employees were not targeted for their union activity, again, is not legally dispositive because an employer could, for instance, think that Mr. Williams was the ringleader. What would you say is the reason, if there is a disparate treatment, what would you say is the real reason for it? Non-protectable reason for it? Or even protection? What reason would they fire him if not then, if it's really based on animus? For example, they could have thought he was the ringleader of the overtime protest movement and they needed to make an example out of him. They could have decided, well, this is the straw that broke the camel's back. We've been putting up with this overtime protest long enough, but now we're going to go after someone. Yeah, he went farther than they said, and that was the straw that broke the camel's back. I'm not sure that actually he had a case on that. Well, again, Your Honor, I would say that, I would point you to this court's previous decision in this case before the remand, where it says they fired him because of the content of his message. Which, yeah, refers to the content of his message. What he wrote, not the fact that, the language that he used, not the fact that he wrote it on a bulletin or on the overtime sheet. And so I don't think Consalium can get away from that finding and saying, well, we fired him for writing it down, so therefore he's different than these other individuals. The court has already told you that it's the content of his message. Well, the employees were expected to put their names. It's not different than using it in conversation in your case. The employees' names, it was a printed list. Everyone's name was already on the list, including Mr. Williams' name. Now, some employees would have to check, like, I will work overtime this week. But I would also point you to evidence that a supervisor on the radio used this very same phrase and told employees, hey, come down and sign the horror board. And so anyone who thereafter went and signed their names, it was as if they were subjecting themselves to the same language. So the fact that you wrote it on this board is not, in that sense, different than what other people were doing. And there was no discipline. I would also point out that other individuals continue to use, other employees continue to use the same phrase after Mr. Williams was fired. That's at JA 107. And there's no evidence that any of them were disciplined. So again, this idea that Consalium was turning over a new leaf is just not actually supported under the facts of this case. And an employer cannot use EEO laws to immunize retaliation under the NLRA. Conversely, are you saying that a union employee can use union status to immunize contributing to the hospital workplace? No, no. So isn't that a wash? That argument washes out, doesn't it? I acknowledge that there's a tricky, that can be a tricky situation. There can be a rock and a hard place. But here, Consalium put itself in between the rock and the hard place by not taking action against anyone else who is using this language and other profane and segregated language. They may have put him on the rock side, but he put him in the hard place, didn't he? Well, but he was using the same language. And so if they really felt they needed to get rid of this language, they could have done so. They could have done so earlier. They could have even done so, this was, they could have done so in response to Mr. Williams, I would submit. They could have said, everyone uniformly, just like Judge Wilkins was saying, a uniform policy, everyone stop using this phrase. And that would have gotten them, that would have gotten them some of the way, or perhaps all of the way, it would have gotten them to respond to their fears of hospital work environment in a way that doesn't run afoul of the NLRA. But they didn't do that. Because we do have two statutes here. It does matter that he was engaged in NLRA protected activity when protesting the overtime policy. I would point to this court's, I think they cite in their, considering cites in their brief, a language from the court's decision in ADTRANS, which was about a broad workplace rule. But I would point the court to page 27 to 28 of that opinion, where it says, we recognize that the uneven or partial application of a rule against abusive and threatening language could constitute an unfair labor act. And that's the situation we have here. An uneven and partial application of an anti-harassment policy to single out someone engaged in NLRA protected activity. That is retaliation. Disparate treatment is classic evidence of retaliation. That defines the, that answers the question here in this case. May I ask that you enforce the board's opinion unless there are further questions. All right. Thank you. Mr. Kilbert. May it please the court. Nathan Kilbert on behalf of Local 5668. I'd like to address, first off, the question of the employer who wishes to turn over a new employee. Contrary to the suggestions of a counsel for appellant, the union is not taking the position that it should be impossible for an employer to turn over a new leader. Merely that the employer could not be permitted to fairly assert that it has turned over a new leader. I'd like to call the court's attention to the fact that the company announced or reaffirmed its purported zero tolerance policy with respect to harassment in a document dated at the end of February of 2013. But subsequent to that, the company tolerated all of this oral use of the offensive phrase at issue here by both employees and by supervisors. And they did not take action against any of those individuals or against any other individual in the record for harassing or inappropriate conduct until they discharged Mr. Williams some six months later in October of 2013. That's not turning over a new lead. And the board could not be obligated to take an employer's word on that issue. How does the union reconcile the position it's taking with the fact that some union members who felt targeted by this act, who felt harassed, who felt intimidated by this act? So the company has an obligation to maintain a workplace free of harassment. And we think that they ought to do that. But we think that similarly, they ought not to engage in conduct that retaliates against individuals who engage in activity. They ought to genuinely enforce a policy that does not permit harassment. With that, I have no more questions. Thank you. Mr. Keneally, why don't you take two minutes? Thank you. Just a couple of points in rebuttal. The board council referenced this court's 2019 opinion discussing that Constellium took action based on the content of Mr. Williams's message. I think the board council is taking that out of context because the question in that case was about whether the employer was solely motivated by the defacement or was also motivated by the content. We're not disputing at this stage that both of those motivations were present. And this court even used the phrase, not simply for defacing property. That was the finding that this court made. And I think it's clear on any fair reading of the record that Constellium was motivated in part by where and how Mr. Williams used this phrase. Board councils mentioned that maybe Mr. Williams was targeted because he was thought to be the ringleader of the protest. There's absolutely no evidence of that in the record. That's entirely speculative. And the record does show that there were 50 employees who filed grievances about the new overtime policy. And so the company had every opportunity, if that had really been its motive, to take action against the boycott supporters. And then finally, just to address the point about whether Constellium turned over a new  All that that says is that he continued to hear the phrase after Mr. Williams is firing. It does not say that Constellium never instructed employees to stop. And I really am at a loss to figure out how an employer who has not corrected misconduct in the past could ever do so when the conduct continues but is done for the sake of some misconduct, even if it should have been corrected as evidence of disparate treatment. So we would ask that the court deny enforcement of the board's order. Why couldn't the company say, look, here on out, whether you are conducting any sort of You can't use these terms. You can't say these sorts of things. And you put everyone on notice that you have a zero tolerance policy, and it doesn't matter whether they are engaging in protected activity or not. And so you have turned over your new leaf. And then the next time that someone does it, you discipline them, even if they're engaged in protected activity. And why isn't the company covered then if that's what happened? Well, we think that that's what happened here. The company did put out a new rules of conduct, a new anti-harassment policy after the 2012 jury heard it, that it can't, maybe it doesn't catch every single person who engages in misconduct. That's not often feasible, especially with things like graffiti. But the evidence here is that people were saying it over the radio, supervisors are saying it, et cetera, after that new policy has been announced, right? Isn't that the evidence that's indirect? There's no evidence that any of those people prompted complaints from their co-workers, that that led to an investigation, and that the company knew who was engaged in the misconduct and had a meaningful opportunity to discipline them. There is really, I think the evidence is exactly what Your Honor said, but there's not that missing link that shows that the employer knew about it, could have stopped it, and that its failure to do more suggests that it had animus against the overtime protest. Thank you. All right, thank you, counsel. Madam Clerk, would you call the next case, please?
judges: Henderson, Wilkins, Sentelle